STATE OF MAINE
Cumberland, ss. Clerk's Office
SUPERIOR COURT
JAN 6, 2000

RECEIVED

STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-97-225

REC.COM-1/6/2000

VIKING FREIGHT, INC., )
)
Plaintiff, )
)
v. )          DECISION AND ORDER
)
MARK MOBERG, et al., )
)
Defendants. )

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Viking Freight, Inc. once operated four terminals of a nation-wide trucking system in Maine. Stipulation, ¶1. The four terminals were located in Bangor, Portland, Presque Isle and Sidney. Stipulation, ¶2. Additionally, Viking operated a general corporate office in Bangor that served as headquarters for Viking's Northeast operations. Stipulation, ¶¶3-4. In September of 1996, Viking announced the closing of the Bangor regional headquarters, which was comprised of two buildings, a general office and an annex to that building. Stipulation, ¶56. During 1997, Viking closed its four Maine terminals. Stipulation ¶¶11-12.

Viking commenced this action, seeking declaratory judgment to determine its liability under Maine's Severance Pay Statute, 26 M.R.S.A. §625-B. Intervening Defendants ("Defendants") counterclaimed under the federal Worker Adjustment and Retraining Act ("WARN Act"), 29 U.S.C. §2101, under the Maine Severance Pay statute and for unpaid wages pursuant to 26 M.R.S.A. §626. The Superior Court (Calkins, J.) granted partial summary judgment in favor of plaintiff, holding that

three out of four of Viking's Maine terminals (Sidney, Portland and Presque Isle) were not "covered establishments" under the Severance Pay Statute. See Order, July 27, 1998. Justice Calkins also dismissed Defendants' claim for unpaid wages. Id. Remaining in this suit are the severance pay claims of those Defendants who worked in Bangor or those Viking employees who "primarily worked out of the Bangor facility to such an extent that the employee should be considered an employee of the Bangor facility," Order at 8-9, and their WARN Act claims. Plaintiff and Defendants have filed cross-motions for summary judgment on these issues.

## II.  SEVERANCE PAY

If a company closes a facility that is a "covered establishment," it is liable for severance pay for employees of the covered establishment under 26 M.R.S.A. §625-B[1]. That section defines "covered establishment" as "any industrial or commercial *facility* or part thereof which employs or has employed at any time in the preceding *12-month period 100 or more persons*." Id. (emphasis added) In her July 27, 1998 Order ("Order"), Justice Calkins held that only Viking's Bangor operations could possibly constitute a "covered establishment" under the statute, since Bangor was the only location that arguably employed over 100 employees during the year prior to closing.

The issue was not raised and therefore Justice Calkins did not address whether separate buildings operated by Viking within the same city should be

---

[1] Section 625-B(2) states:
> Any employer who relocates or terminates a covered establishment shall be liable to his employees for severance pay at the rate of one week's pay for each year of employment by the employee in that establishment.

considered one facility or separate facilities. At issue currently is whether the Bangor operations should be considered one "facility" for purposes of determining liability as a covered establishment.

The three buildings that make up the Bangor "site" are the terminal, the annex and the general office. Each should be examined separately to determine whether they were part of the same "facility." See Order at 7, quoting Justice Alexander's opinion in Ewing v. Fort Halifax Packing Co., No. CV-81-516 (Ken. Cty., Oct. 29, 1982). For the Bangor operation to be considered a "covered establishment," Defendants must succeed twice. First, all three of Viking's Bangor buildings would have to be considered one "facility." No combination of two of the buildings would bring the number of employees at Bangor over 100. Plaintiff's Statement of Material Facts ("PSMF") ¶12. Furthermore, Defendants have to show that the Bangor site employed over 100 people within a year of the termination of operations.

A.     Legislative Intent

The intent of the severance pay statute is to compensate a large number of workers within a community who abruptly lose their jobs. See L.D. 424, Statement

3

of Fact (105th Legis. 1971)[2]. When a group of one community's employees is suddenly unemployed, the community must be able to absorb the impact of the unemployment. Id. The statute seeks to soften the blow to a community faced with such a situation. Id.

The number of employees specified in the statute serves the purpose of furthering this legislative intent. The Legislature determined that any community that lost 100 jobs from the same employer within a year needs some help.

B.    Integration of the Three Buildings

In order to apply the legislative intent, the three judges who have interpreted the meaning of "covered establishment" have developed an "integration" paradigm, in which buildings' proximity and function are analyzed for similarities. See Order at 6-8 (Calkins, J.); see also Faloon v. W.S. Libbey Co., No. CV-91-158 (And. Cty. Nov. 24, 1992) (Lipez, J.) ("although the word 'facility' may sometimes connote a single location, a 'single location' definition of facility makes no sense when an employer operates an integrated group of facilities in one city"); Director of Bureau of Labor Standards v. Fort Halifax Packing Co., 510 A.2d 1054, 1064 (Me. 1986) (upholding severance pay to employees not stationed in covered establishment but

---

[2] 26 M.R.S.A. §625-B was originally enacted as 26 M.R.S.A. §625. The severance pay provision was added in 1971. The Statement of Fact accompanying that enactment states:

Employers of large numbers of employees have closed their businesses without notification to their employees of the impending closedown.

Such lack of notice enhances a period of economic recession which invariably results in a community where large numbers of people simultaneously lose their jobs.

This bill would alleviate the adverse economic impact upon the employees and the community in which they live.

4

who performed jobs "essential" to functions of covered establishment and who lost their jobs aa a result of closing of covered establishment), aff'g Ewing v. Fort Halifax Packing Co., No. CV-81-516 (Ken. Cty. Oct. 29, 1982) (Alexander, J.).

The various functions of the annex, general office and terminal must be studied to gain perspective on whether Viking's Bangor operations are sufficiently integrated to be considered one "facility."

As a threshold matter, it can be determined that the annex and general office should be considered the same "facility," even though the annex was located 2/10 of a mile down the road from the general office. Stipulation, ¶8. The general office and annex performed virtually the same functions, and the annex was created to contain the overflow from the general office once the general office became too crowded for the operations conducted there. Id. Both the general office and the annex closed in September of 1996. Stipulation, ¶57.

The terminal and general office were located on "a single piece of real estate." Stipulation, ¶3. The terminal employees provided service to company vehicles used by employees of the general office. Stipulation, ¶28. The terminal building had a storage area used by the annex and the general office. Stipulation, ¶29. Before the general office closed in December of 1996, the Bangor terminal compiled its payroll information and forwarded it to the general office to be further processed. Stipulation, ¶¶32-22. The general office employees handled damaged freight. Stipulation, ¶38. Employees of the terminal occasionally provided routine maintenance to the general office and also helped move furniture and picked up

5

mail. Stipulation, ¶39. The terminal's billing clerk provided some help to the general office, and vice-versa. Stipulation, ¶39, 47. A central switchboard located in the general office routed calls to its office, as well as to the terminal and the annex. Stipulation, ¶52. Several employees were transferred between the three Bangor locations. Stipulation, ¶55.

Since Viking's Bangor facilities were located close to each other and performed cooperative and complementary functions in the shipping business, they can be considered as component parts of a whole "facility." Holding that the Bangor operations constituted one "facility" is consistent with the legislative intent to protect employees who lose their jobs en masse within a community. To allow an employer to scatter its employees into separate buildings within a community and avoid the 100-person threshold would permit those employers to evade the intent of the statute by elevating form over substance. Accordingly, this court holds that the three buildings together made up Viking's Bangor "facility."

### C.   Number of employees

The severance pay issue is not decided simply by holding that the buildings made up one "facility," because the facility also must have employed over 100 people during the relevant time period before it can be considered a "covered establishment." Both parties stipulated that, during its last year of operations, Viking employed at least 99 people in Bangor. Stipulation, ¶15. Defendants submitted at least seven arguments in their attempts to increase the total of employees from the stipulated 99 to the 100 employee minimum.

6

One of these arguments has merit, raising a genuine issue of material fact as to when Viking ceased operations in Bangor. Stipulation, ¶¶15-16. The arguably valid contention is that the date of the closing was earlier than asserted by Plaintiff.

Defendants assert that the date of closing was in fact March 27, 1997 and not April 2, 1997, as Viking contends. On March 28, 1996, Viking employed at least 101 people. Two employees left between March 28, 1996 and April 2, 1996, one on March 29 and one on April 1. Stipulation, ¶16(b&e).

It is undisputed that Viking announced that it was closing down the entire Northeastern Division on March 27, 1997. Stipulation, ¶62. That evening, Viking held a meeting for employees informing them. Id. At the meeting, Viking informed its 36 Bangor terminal employees that any freight currently in the system was to be delivered on March 28, 1997, and that any freight remaining would be delivered by another carrier. Id. Employees were given the opportunity to volunteer, in order of their seniority, to work delivering freight and assisting with the shutdown. Stipulation, ¶63. All of the drivers, dock workers and office employees worked on Friday, March 28[3]. Id. The next Monday, March 31, six employees worked cleaning the terminal and the office. Id. During that week, some drivers worked driving empty trailers and some employees continued to work in the shop. No drivers worked after April 2. Id. Most of the work was completed not later than April 2, but several mechanics and the terminal manager continued to

---

[3] The Stipulation, ¶63, reads "a number of the drivers, dock workers and office employees worked Friday, March 28." However, paragraphs 63-64 of the Stipulation show that all of those workers worked on that date.

work. Id. Thirteen of the 36 employees worked their last day on March 28, two more on March 31, two more on April 1, eleven more on April 2 and the remaining 8 on or after April 4. Stipulation, ¶64.

Section 625-B(1)(G) defines termination as "the substantial cessation of industrial or commercial operations in a covered establishment." The parties have raised a genuine issue as to whether Viking's operations had substantially ceased prior to April 2, 1997.

## WARN ACT

The WARN Act, 29 U.S.C. §2104, requires employers to give employees advance notice of an impending layoff. The WARN Act analysis, however, differs from that of the Maine Severance Pay statute in that it is triggered when 50 employees will be affected within a 30-day period. The WARN Act requires employers to give "affected employees sixty-day notice before mass layoffs or *plant closings* which would result in the termination of a large number of jobs." Washington v. Aircap Indus. Corp., 831 F.Supp. 1292, 1295 (D.S.C. 1993) (emphasis added). 29 U.S.C. §2101(a)(2) defines "plant closing" as:

> the permanent or temporary shutdown of a *single site of employment*[4], or one or more facilities or operating units

---

[4] 20 C.F.R. §639.3(i) illustrates what constitutes a "single site of employment:"

(1)  A single site of employment can refer to either a single location or a group of contiguous locations. Groups of structures which form a campus or industrial park, or separate facilities across the street from one another, may be considered a single site of employment.

. . .

(3)  Separate buildings or areas which are not directly connected or in immediate proximity may be considered a single site of employment if they are in reasonable geographic proximity, used for the same purpose, and share the same staff and equipment. An example is an employer who manages a number of warehouses in an area but who

8

within a single site of employment if the shutdown results in an employment loss during any 30 day period for 50 or more employees *excluding part-time employees.*

For Plaintiff to be liable under the WARN statute, it must have announced a shutdown of a "single site of employment," causing 50 *full-time* employees to suffer a job loss within a 30 day period. The parties stipulate that the number of employees at the Bangor terminal at the time of the closing announcement was 36[5]. Stipulation, ¶64. The Presque Isle terminal had ten employees at the time of the announcement. PSMF 19, 42.

Defendants' WARN Act claim fails. The Bangor and Presque Isle terminals do not constitute a "single site of employment." See Wiltz. v. M/G Transport

---

regularly shifts or rotates the same employees from one building to another.

(4)     Non-contiguous sites in the same geographic area which do not share the same staff or operational purpose should not be considered a single site. For example, assembly plants which are located on opposite sides of a town and which are managed by a single employer are separate sites if they employ different workers.

(5)     Contiguous buildings owned by the same employer which have separate management, produce different products, and have separate workforces are considered separate single sites of employment.

(6)     For workers whose primary duties require travel from point to point, who are outstationed, or whose primary duties involve work outside any of the employer's regular employment sites (e.g., railroad workers, bus drivers, salespersons), the single site of employment to which they are assigned as their home base, from which their work is assigned, or to which they report will be the single site in which they are covered for WARN purposes.

. . .

(8)     The term "single site of employment" may also apply to truly unusual organizational situations where the above criteria do not reasonably apply. The application of this definition with the intent to evade the purpose of the Act to provide notice is not acceptable.

See also Wiltz, 925 F.Supp. at 504 ("The regulations only fine tune the application of the WARN Act in ambiguous situations within the same locality").

[5] The employees assigned to the annex and general office in Bangor are not relevant to this discussion because those buildings ceased operations in December 1996, well removed from the 30-day window of the WARN Act.

9

Services, Inc. 925 F. Supp. 500, 503-04 (E.D. Ky. 1996), *rev'd in part on other grounds*, 128 F.3d 957 (6th Cir. 1997) ("[w]here... the sites are not in the same geographic area, they are separate sites of employment as a matter of law"); In re Jamesway Corp., 1997 WL 327105, *16 (Bankr. S.D.N.Y. 1997) ("Local communities are not as adversely affected by the sudden unemployment of a large number of workers at a geographically separate site").

The entry is

> Plaintiff's Motion for Summary Judgment on the WARN Act count is GRANTED. Both Plaintiff's and Defendants' Motions for Summary Judgment on the Severance Pay counts are DENIED. The case will proceed to trial to resolve the issue of the number of employees at the Plaintiff's integrated Bangor "facility."

Dated: ~~December 28, 1999~~ January 6 2000

Robert E. Crowley
Justice, Superior Court

10

Date Filed  04/11/97  CUMBERLAND  Docket No.  CV97-225
County

ALAN HINSEY, DIR. BUR. LABOR STANDARDS, STATE OF MAINE;
(MARK MOBERG, MARY WILSON, PHILLIP RUSSELL, MATTHEW
BODINE, NORMAN SCOTT, DALE BLACKWELL, DANA HAYES,
STAN MCAVOY, ROBERT CUMMINGS, BLAINE HUBBARD, MICHAEL
KONDAS, VIRGIL WHITNEY, STEVEN TRAVERS, LORI CLOSSON,
GENE CARTER, FRED BLASCHKE, PETER BREWER, RAY
MCMILLAN, THOMAS SHAFER, JOSEPH BERNARD, ANDREW
MCPHERSON, JOHN WALLS, GARY GRAVEL, THEODORE GONSKA,
PENNEY MEADER, DONALD TORTIN JR., GARY MORIN, CHRIS
LAMB, MARK BEALE,)GEORGE ADAMS, MARY LOU GALLAGHER,
PATRICIA HUGHES, ELIZABETH JOHNSON, DONALD POWERS,
WILLIAM TRACY, DOUGLAS BRADFORD, RUSSELL JIPSON,
CHRISTOPHER LYNDS, ALYSON MORRISSEY, CARY BISHOP,
HERMON BROWN, RICHARD BROWN, PAUL BURNETT, HENRY
CHASE III, DAVID CROTEAU, LINWOOD EICHEL, RICHARD
FLOREY, TOMMY HILIMAN, GEORGE LAVOIE, GARY LUSIGNAN,
DEAN MEAGHER, LEWIS NORRIS, GARY RICKER, ROBERT
ROBINSON II, ROBERT SHAW JR., KENNETH STEVENSON,
DAVID VIOLETTE, HAROLD WHITE, WILLIAM KING, DANIEL
MAYNARD, KENNETH MCPHEE, ELMER MORIN, KEITH O'BRIEN,
EDMUND PELLETIER, ALAN ROOPE, SYLVIO SAUCIER

ActionEQUITABLE ACTION - DECLARATORY JUDGMENT

(judgment 9-9-99)

VIKING FREIGHT, INC.

vs.

judg.
9-9-99

Plaintiff's Attorney
MARY DELANO ESQ. 775-3581
PO BOX 7486, PTLD ME 04112-7486

DONALD L. GARBRECHT w/d
LAW LIBRARY

FEB 7 2000

**DEFENDANTS ATTORNEY:**
GWENDOLYN THOMAS AAG (A.HINSEY & ME) 626-88
6 STATE HOUSE STA. AUGUSTA ME 04333-0006
WILLIAM LAUBENSTEIN ESQ. (ALL OTHERS)623-5
PO BOX 29, AUGUSTA ME 04332-0029 &
PHILLIP JOHNSON ESQ. (CO-COUNSEL)

CHARLES GILBERT (ADAMS/37 Others) 947-222
PO BOX 2339 BANGOR ME 04402-2339

| Date of Entry | |
|---|---|
| **1997** Apr. 11 | Received 04/11/97: Complaint Summary Sheet filed. Complaint filed. |
| May 05 | Received 05/05/97: Order filed. (Brennan J.) It is hereby ORDERED, upon motion of Defendants and without objection by Plaintiff, that the deadline for filing an Answer in the above-captioned case is enlarged to June 05, 1997. On 05/08/97: Copy mailed to Mary Delano and Gwendolyn Thomas Esqs. |
| "    " | Received 05/08/97: Summons filed. Defendant, Bureau of Labor Standards served on 04/16/97 to Alan Hinsey, Director. |
| "    " | Defendant, State of Maine served by certified mail on 04/14/97 to Gwendolyn Thomas AAG. |
| June 04 | Received 06/04/97: Defendant's Motion for Enlargement of Time to File Answer filed. |
| June 06 | Received 06/05/97: Order filed. (Calkins J.) It is hereby ORDERED, upon motion of Defendants and without objection by Plaintiff, that the deadline for filing an Answer in the above-captioned case is enlarged to June 26, 1997. On 06/06/97: Copy mailed to Mary Delano and Gwendolyn Thomas Esqs. |
| June 26 | Received 06/26/97: Defendant, Alan Hinsey, Director, Bureau of Labor Standards and State of Maine's Answer filed. |
| July 10 | Received 07/10/97: Case File Notice and Pretrial Scheduling Statement and Jury Demand filed. |